IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-14002-CR-ROSENBERG

UNITED STATES OF AMERICA

vs.

JULIUS ANDREW REASON, III.,

    Defendants.

_____/

## SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD VARIANCE FROM THE ADVISORY SENTENCING GUIDELINES

COMES NOW the Defendant, JULIUS ANDREW REASON, III, by and through his undersigned counsel, and respectfully files this sentencing memorandum in order to assist the Court at the sentencing hearing scheduled for February 28, 2017. [DE 221]. At the time of sentencing, the Defendant will be requesting this Honorable Court to vary downward from the advisory guideline range computed by this Court and impose a sentence that is sufficient but not greater than necessary which is also reasonable in light of the unique facts and circumstances of this case. The Defendant suggests that a sentence between 8 to 10 years (96 months to 120 months) is appropriate.

Julius Andrew Reason, III., stands before the Court, having plead guilty and accepted responsibility for the offenses he committed. He is remorseful for his decisions and apologetic to those he has affected by his actions, most importantly his wife. The advisory sentencing guideline range as reflected in the PreSentence Investigation Report indicates that the Defendant falls into a total offense level of 39 with a criminal history category of VI. [DE 170, ¶126]. The advisory guideline range is therefore 360 months to life, which in essence is a life sentence even if given the bottom of the guideline range. This is an overly excessive range of punishment,

substantively unreasonable to impose and clearly could not have been what the United States Legislature nor the Federal Sentencing Commission contemplated. A downward variance is certainly in order.

Pursuant to 18 U.S.C. 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary". There were no deaths or measurable harms that can directly be connected to this Defendant and such a harsh long prison sentence is not consistent with the relevant conduct in this case even in the light most favorable to the government.

As this Court is fully aware, pursuant to United States v. Booker, 543 U.S. 220 (2005), the Supreme Court has made it very clear that district courts must consider all of the sentencing factors under 18 U.S.C. Section 3553(a)(1)-(7) without giving mandatory weight to the sentencing guidelines. Having said this, the following are examples of factors which this Honorable Court must consider in ultimately imposing a sentence, notwithstanding the advisory guideline range calculated by the Court. In determining a minimally sufficient sentence, Section 3553(a)(1-7) directs sentencing courts to consider the following factors: These include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with need educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence

disparities among defendants with similar records who have been guilty of similar conduct; and (7) the need to provided restitution to any victims of the offense.

## NATURE AND CIRCUMSTANCE OF THE OFFENSE

Section 3553(a) directs this Court to consider the nature and circumstance of the offense in deciding a sufficient sentence. What makes this case unique is not the importation or possession with intent to distribute drugs that originated from a foreign country, but rather the type and class of substances that are involved and the current knowledge we have regarding them. For decades it has been commonplace for courts to deal with people involved in unlawful drugs. Generally speaking, there are plenty of cases that are within the heartland of cases that spell out what type and kind of punishment is appropriate. The research has been done and all would agree. The case before the Court involves two substances, i.e. Ethylone and Dibutylone. These are two relatively new substances. The truth is that there is very little reliable data available at this point to make informed decisions as to what is most substantially similar to these substances from a chemistry and pharmacological standpoint. Given this lack of reliable data and uncertainty at this moment in time, the ratio that the government seeks, to wit: 500:1, astonishingly inflates and results in an inconceivable base offense level for these substances. By way of comparison, this ratio is even higher than the crack cocaine equivalency of 100 times that of powder cocaine which was promulgated by the legislature during the Anti-Drug Abuse Act of 1986. In the decades since, extensive research by the United States Sentencing Commission and other experts has suggested that the differences between the effects of the two drugs are exaggerated and that the sentencing disparity is unwarranted. The ratio is now 18:1. See Fair Sentencing Act of 2010. Additionally, congress has even eliminated the five-year mandatory minimum sentence for possession of crack cocaine. Id.  Since the Court's job is so difficult at

weighing all of this complex subject matter, hotly debated by experts on both sides and there is a likelihood that additional research by the Sentencing Commission and other experts may yield clearer answers; like it did for crack cocaine, to the questions presented by the Court, applying the rule of lenity at this time or giving the benefit of doubt to the Defendant based upon uncertainty would be most appropriate. If the Court believes that the 500:1 ratio is just too large an increase for what is presently known, that would be a legitimate basis to disregard the elevated guideline range. see Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). (Court suggested that the 100 to 1 ratio regarding "crack" created an unwarranted disparity with the meaning of § 3553(a) and did not have to apply this ratio in imposing sentence). For these reasons alone, a downward variance for Mr. Reason is justified.

Another factor that this Court can consider in support of varying downward from the advisory sentencing guidelines is the fact that although ethylone and dibutylone were designed or at least intended to be substitutes for MDEA and MDMA, they are not the same thing. Both sides would agree that there are differences, however slight, both structurally and from a pharmacological standpoint between ethylone and MDEA and dibutylone and MDMA. In fact, while it is the government's position that Ethylone and Dibutylone were substitutes or replacements for these older types of drugs, the Defendant would suggest that they were considered by dealers and many users to be "watered down" versions, touted as legal to buy over the internet. While Mr. Reason is certainly not a Ph.D in chemistry or pharmacology, his understanding that you could openly purchase these types of substances over the internet led him to reasonably believe that while they may not have been legal to purchase, they could not be as potent as the real thing. In its true form, neither MDMA or MDEA was ever openly offered for sale over the internet. Mr. Reason had always considered the substances he imported from China

to be the lesser of two evils and like mentioned earlier, a "watered down" version of what was previously in high demand.  Mr. Reason would in fact, tell the Court first hand, that he had been a user of all these drugs and that ethylone and dibutylone were nowhere as potent as traditional MDMA nor were the effects the same. Mr. Reason had always experienced another type of effect, (i.e. mellow, calm feeling) which is much different than what the government experts suggested the effect of these types of drug would be.  Mr. Reason, while acting with willful blindness, relying on a Chinese computer operator to advise him on the legality of the substances, knew that he was skirting the law but at the same time believed he was importing a product that probably didn't measure up to the real thing.

While subjective belief of a defendant is oftentimes relevant in the guilt phase during a trial, See United States v. Tobin, 676 F. 3d 1264 (11th Cir. 2012), it should certainly be a factor for this court to consider at sentencing. The subjective understanding and intention of the Defendant, (i.e. that he was importing an illegal replacement, less potent "knock-off" drug) is relevant to this Court's determination as to what sentence to impose. See United States v. Oba, 448 F.2d 892 (9th Cir. 1971).

## HISTORY AND CHARACTERISTICS OF JULIUS REASON

For this Court to really know Julius Reason as a person, perhaps the following will give a glimpse into his life in support of a downward variance from the advisory guideline range. While the Defendant was raised by loving parents and was never neglected as a child, there did come a time when things got real bad for him. Let's just say Julius Reason found himself in a dark place. Beginning in 2007, when he should have been accelerating in college, he found himself academically ineligible to finish with schooling. Finding himself with financial hardships not only effected his schooling but also caused him to get kicked out of a trailer he was residing in.

He soon became homeless, forced to live in the backseat of his 1993 Buick LaSabre in a parking lot. The dire circumstance of Julius not eating for days at a time during this period prompted him to start selling small amounts of drugs; both times are reflected in the PreSentence Investigation Report. [DE 170, ¶ 79, 80]. When the Defendant was finally released from jail in June, 2008, he decided that he would try to turn his life around and try to pursue something positive again. The Defendant started working with his uncle in the Air Conditioning Industry. The company was called "In Reason Air Conditioning". In fact, the Defendant became so motivated to improve his life at that time that he started to attend college again in 2008 through 2009. The Defendant focused on the air conditioning trade and ultimately received a Certificate in H-VAC in 2009. The Defendant still maintains these skills and has the potential to become marketable once again. What is also telling of Mr. Reason's character is that he volunteered hours of his time, helping out at places like Habitat for Humanity, Gifford Youth Activity Center and the Gifford Little League. On occasion, the Defendant also did volunteer work at Botanical Gardens doing clean-up and other landscape work. The Defendant was always very giving, especially to the homeless on the streets where he would provide them with a dollar or whatever spare change he had to give.

     As luck would have it, the Defendant again hit a dry spell and was primarily unemployed from sometime in 2011 through 2013. It was during this time that he met his present wife, Venteria Reason. She helped him get on his feet for a little while. The Defendant was desperate to work and earn his own money. In fact, the Defendant put in applications to no fewer than 35 jobs up and down the Space and Treasure Coast, however, to no avail. Having established a good relationship with Venteria, Julius gained confidence and believed that he could become successful for once in his life. In this spirit, beginning in 2013, the Defendant actually started a

lawn service business. He didn't have many customers and primarily did work for close friends and family members. Even though he thought he could turn this into something profitable, it was really never enough to support his family and once again Julius found himself wondering what he was going to do next.

## PRIOR RECORD

While the Defendant's prior criminal history is somewhat lengthy by way of the number of arrests, it is not utterly egregious and does not deserve to be classified the same way that a career offender, which is also category VI would be. This he is not! None of this is to say that the Defendant has led a responsible life or has avoided criminal conduct. Defendant's criminal history is calculated to be at a category VI.[DE 86].  A career offender's criminal history category in every case is also a Category VI. See USSG 4B1.1(b).

To put things into perspective, most of his adult record involved either small amounts of marijuana, cocaine, alcohol and traffic related offenses dealing with his suspended license. These types of crimes are far different than those committed by career offenders or violent habitual offenders where courts have imposed severe punishments.  The most serious offense the Defendant committed, took place back in September, 2007.  When he was only 23 years old, he received a year in jail for delivering a small amount of crack in which he received $150.00. [See PSI DE 170, ¶ 80]. The Defendant happened to be homeless at the time and living out of his car in a parking lot when he sold this small amount of drugs to barely get by. While the Defendant has been in and out of the county jail system, he has never been considered to be such a threat by any judge to serve prison time.

The mandate of 18 U.S.C. §3553(a) is, of course, for the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in

the second paragraph of that same statute. In Rita v. United States, 551 U.S. 338, 347-348 (2007), the Court summarized the now often-cited factors found in that second paragraph that have already been mentioned above. In this case, the overstatement of the Defendant's criminal history resulting in a criminal history category of VI produces a guideline range that, at the very least, brutally exceeds what is necessary to provide just punishment, deterrence, incapacitation, and rehabilitation.

In cases such as this where prior criminal history significantly overstates the seriousness of the criminal history category, courts have wide discretion to depart downward and sentence a defendant in an otherwise applicable guideline range that is more reasonable and just. United States v. Moore, 541 F.3d 1323 (11th Cir. 2008). The Defendants prior record are all nonviolent offenses and doesn't necessarily show any particular pattern of escalating criminal conduct that suggests a likelihood that the defendant will commit further crimes in the future. There is no minimum mandatory sentence that must be imposed in Mr. Reason's case.

Even in cases where offenders are designated career offenders, courts have applied these same principles and imposed reduced sentences. In United States v. Williams, 481 F.Supp.2d 1298 (M.D. Fla. 2007), on remand from the Court of Appeals decision at 456 F.3d 1353, the court imposed a sentence of 204 months rather than the 262 to 347 months called for by the career offender guidelines. Id. at 1305, 1303. In doing so, the court stated:

In sum, Williams is a street-level dealer of crack cocaine. He is not a king pin, managing a large-scale drug enterprise. While the sale of crack cocaine is a serious offense, severity is a relative concept, and the guideline sentence of thirty years would be grossly disproportionate to the seriousness of the offense.

Id. at 1304.

In United States v. Gibson, 442 F.Supp.2d 1279, 1285 (S.D. Fla. 2006), where the career offender guidelines advisory range was 360 months to life, the court imposed a sentence of 140

months.  In doing so, the court relied in part on the nature of the defendant's prior convictions, which largely "consisted of sales between one and three rocks of crack cocaine."  *Id.* at 1284.  Similarly, the Defendant's criminal history consists of 8 points for driving on a suspended license and the remaining 8 points as follows: 2 pts – 1 piece of crack; 2 points – sale of $150 worth of crack; 2 pts - $50 worth of cocaine; and 2pts – misdemeanor amount of marijuana.

## FAMILY LIFE

The Defendant is currently married to the Co-defendant, Venteria Reason. They met in 2010 and married in 2014.  While they only have one son in common, Julius Amare Reason, age 3, the Defendant helped raise Venteria's other two children as if they were his own. Despite the situation she finds herself in, having been brought into this offense by her husband, she would still tell the Court that she and the Defendant had a good relationship and that the Defendant was a great father and stepparent to her own children. [See PSI DE 170, ¶ 100].  The Defendant takes full responsibility for getting his wife involved in his wrongdoing and does not want their children to suffer or pay the price for his actions. Children growing up without their parents poses all kinds of problems. It would be very sad for these children to be any more emotionally scarred than they already are and to grow up without either one or both of their parents would be horrendous. While the Defendant prays for mercy for himself, he really implores this Honorable Court to show leniency for his wife so that she can be out of jail sooner to take care of the children. While Venteria Reason plead guilty for her own actions in this matter, the Defendant wants the Court to know that he was primarily responsible for getting her involved in the first place.  The Defendant would even tell this Court that if it meant Venteria Reason getting out of jail sooner than later, that he would be willing to be punished more just so the children can be raised by their natural parents.

<u>DETTERENT EFFECT</u>

Mr. Reason has learned a grave lesson from his bad decisions in this case and it is highly unlikely that he would ever repeat this type of conduct again. A lengthy prison term as the advisory guidelines suggest is not necessary to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Mr. Reason has already lost a lot, having been incarcerated since last year. Anything that he accumulated or cherished, including his wife and children are lost. Mr. Reason never anticipated or wanted to be a defendant in Federal Court nor would any of his family or friends suggest that he was destined for this type of lifestyle. His dreams as a child were to be a football player. He attended and graduated high school and began attending college with a partial football scholarship, but had to withdraw due to financial reasons. A lengthy prison term therefore is not necessary for specific deterrence, as he has already lost everything and must start anew. Any need for general deterrence has also been satisfied by the government's initial decision to bring charges in this case. This prosecution and other alike, make it well understood that people who purchase these types of substances, even if you could easily purchase them over the internet, will not be tolerated. Therefore, a sentence far below the advisory range, even a sentence between 8 to10 years (96-120 months) is more than adequate to deter other individual from engaging in this type of conduct.

Despite the troubles of this Defendant and the perception the government draws upon him, Julius Reason is otherwise a very personable and likeable person. He has positive attributes which give him redeemable value as a person and these individual characteristics should be considered by the Court. As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted

person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996). With the United States Sentencing Guidelines now rendered "advisory only," a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. See <u>Kimbrough v. United States</u>, 128 S.Ct. 558, 564 (2007). While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration." <u>Gall v. United States</u>, 128 S. Ct. 586, 597 (2007); <u>see</u> <u>also</u> <u>Kimbrough</u>, 128 S.Ct. at 564 ("the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence.")

Clearly, and equally applicable to Mr. Reason is the proposition that the measure of a man should not be limited to his worst days and misjudgments. The court so eloquently explained in <u>United States v. Adelson</u>, 441 F.Supp.2d 506 (S.D.N.Y. 2006), that:

> But, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. The elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophers and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the "history and characteristics of the defendant."

AVOIDING UNWARRANTED SENTENCING DISPARTIES

While there have been very little prosecutions for ethylone, there have been no such reported cases for dibutylone and this uniqueness makes it more difficult for the Court to consider other imposed sentences of similar conduct. One case in particular that involved ethylone, that this Court is very familiar with is <u>United States v. Kevin Bully</u>, 15-80068-CR-ROSENBURG. Mr. Bully actually contested all of the charges and demanded a jury trial which lasted approximately a week. Additionally, Mr. Bully was designated to be a true, "Career Offender" under the law. Not accepting

any responsibility in the matter, he received a sentence of 240 months, well below the 360 months to life advisory range the Defendant scores.

Another Ethylone case in this district, which resulted by plea was United States v. Al Tooks, 15-60216-CR-HULREY. That case involved almost 50 kg of Ethylone as well as 43 kg of Flakka. The Court used a 500:1 stipulated ratio for guideline purposes and Mr. Tooks received 151 months incarceration. This sentence is also far below what the Defendant is facing. The Defendant is also being held responsible for a much lower quantity of drugs than Mr. Tooks.

In summary, the Federal Sentencing Guidelines through the Sentencing Commission has shown great concern for proportionality in sentencing. The Introduction to the Guidelines notes that a primary purpose of the Guidelines, and indeed, a significant purpose of all sentencing, is not just to avoid disparity in the sentencing of offenders, but also to ensure "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." U.S.S.G. § 1A1.1, Introductory cmt. (n.3). The drafters could have avoided disparity all together by sentencing all offenders to life imprisonment no matter what they did. But while that would have made sentencing uniform across the country, it would have been uniformly disproportionate, not to mention grotesquely unfair. In the instant case, the Defendant is facing a 30 year sentence for drug importation and distribution at the bottom of the advisory guidelines, a sentence which exceeds the maximum punishment for some other very egregious offenses. (i.e. sexual exploitation of children, 18 U.S.C. § 2251; enticement into slavery, 18 U.S.C. § 1583; terrorism, 18 U.S.C. § 2322; biological weapons, 18 U.S.C.175c; and even torture, 18 U.S.C. § 2340A. When you put the actions of Julius Reason into perspective and weigh his conduct relative to other atrocities taking place in the world, a sentence that varies downward from an otherwise artificial high guideline range is clearly warranted.

WHEREFORE, the Defendant, JULIUS REASON, respectfully requests that this Honorable Court vary downward from the advisory guideline range to impose a sentence between 8 to 10 years, (96 – 120 months). This type of sentence is "sufficient but not greater than necessary" given all of the circumstances surrounding this case.

>Respectfully submitted by,
>
>JONATHAN S. FRIEDMAN, P.A.
>ATTORNEY FOR JULIUS REASON
>ONE EAST BROWARD BLVD.
>SUITE 925 - WELLS FARGO BANK TOWER
>FORT LAUDERDALE, FLORIDA 33301
>TELEPHONE: (954) 713-2820
>FACSIMILE: (954) 713-2894
>
>/S/ Jonathan S. Friedman_____
>JONATHAN S. FRIEDMAN, ESQ.
>FLORIDA BAR NUMBER: 0973297

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 21, 2017, the undersigned attorney electronically filed the foregoing document with the Clerk of the Court, United States Attorney's Office, and other counsel of record, if any, using CM/ECF and has served same via U.S. Mail to those counsel(s) or individuals, if any, who are not authorized to receive electronically Notice of Electronic Filing.

>/S/ Jonathan S. Friedman_____
>JONATHAN S. FRIEDMAN, ESQ.